
FILED
NOVEMBER 6, 2007
KAREN S. MITCHELL
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| KINNEY BRUNSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:04-CV-0306 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant.[1] | § | |

## REPORT AND RECOMMENDATION
## TO AFFIRM THE DECISION OF THE COMMISSIONER

Plaintiff KINNEY BRUNSON brings this cause of action pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of defendant MICHAEL J. ASTRUE, Commissioner of Social Security (Commissioner), denying plaintiff's application for a term of disability, and disability benefits. Both parties have filed briefs in this cause. For the reasons hereinafter expressed, the undersigned United States Magistrate Judge recommends the Commissioner's decision finding plaintiff not disabled and not entitled to benefits be AFFIRMED.

### I.
### THE RECORD

Plaintiff protectively applied for supplemental security income benefits under Title XVI of the Social Security Act on September 11, 2002. (Transcript [hereinafter Tr.] 47, 50-52). Plaintiff alleges an onset date of December 11, 2001. (Tr. 13, 47, 50). In his Disability Report

---

[1] On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Astrue should be substituted as the defendant in this suit.

plaintiff attributed his inability to work to, "Strokes, depression, trouble remembering, arthritis in spine, ankles, hands and knees, tumors in my legs that come and go, underdeveloped kidneys, heart trouble, blind in left eye, breathing trouble. (Tr. 58). It was determined at the administrative level that plaintiff had not engaged in substantial gainful activity since his alleged onset date. (Tr. 13). Plaintiff was born October 13, 1954, (Tr, 47, 50) and the record shows he completed high school plus two years of college, beauty school and barber college. (Tr. 234). According to plaintiff's Work History Report, and as determined at the administrative hearing, plaintiff's past relevant work, within the past fifteen (15) years, includes work as a Hotel Clerk. (Tr. 16, 68).

The Social Security Administration denied benefits initially and upon reconsideration. An administrative hearing was held before ALJ William F. Nail, Jr., on May 4, 2004. (Tr. 229-260). On July 12, 2004, ALJ Nail rendered an unfavorable decision, finding plaintiff not disabled and not entitled to benefits at any time relevant to the decision. (Tr. 12-17). The ALJ found that plaintiff suffered from a cerebrovascular impairment and affective disorder but that while such impairments were "severe" within the meaning of the regulations, they was not severe enough to meet or medically equal, either singly or in combination, one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 16, Finding Nos. 2 and 3). The ALJ concluded plaintiff retains the residual functional capacity (RFC) for light work. (Tr. 17, Finding No. 5). Based on this RFC the ALJ found plaintiff would not be precluded from performing his past work as a hotel clerk. (Tr. 17, Finding No. 6). The ALJ thus concluded plaintiff was not under a disability at any time through the date of his decision.

Upon the Appeals Council's denial of plaintiff's request for review on October 8, 2004,

ALJ Nail's determination that plaintiff is not under a disability became the final decision of the Commissioner. (Tr. 5-7). Plaintiff now seeks judicial review of the denial of benefits pursuant to 42 U.S.C. § 405(g).

II.
STANDARD OF REVIEW

In reviewing disability determinations by the Commissioner, this Court's role is limited to determining whether substantial evidence exists in the record, considered as a whole, to support the Commissioner's factual findings and whether any errors of law were made. *Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989). To determine whether substantial evidence of disability exists, four elements of proof must be weighed: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94(5th Cir. 1972)). If the Commissioner's findings are supported by substantial evidence, they are conclusive, and the reviewing court may not substitute its own judgment for that of the Commissioner, even if the court determines the evidence preponderates toward a different finding. *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980). Conflicts in the evidence are to be resolved by the Commissioner, not the courts, *Laffoon v. Califano*, 558 F.2d 253, 254 (5th Cir. 1977), and only a "conspicuous absence of credible choices" or "no contrary medical evidence" will produce a finding of no substantial evidence. *Hames v. Heckler*, 707 F.2d at 164. Stated differently, the level of review is not *de novo*. The fact that the ALJ <u>could</u> have found plaintiff to be disabled is not the issue. The ALJ did not do this, and the case comes to federal

court with the issue being limited to whether there was substantial evidence to support the ALJ decision.

## III.
## ISSUES

The issue before this Court involves a determination at Step Four of the five-step sequential analysis, and this Court may only review the issue of whether there was substantial evidence to support the administrative finding that plaintiff retained the ability to perform his past relevant work as a hotel clerk.

The ALJ was required at Step 4, to evaluate the claimant's residual functional capacity, in accordance with his subjective complaints of disabling pain, as well as the physical and mental demands of such past relevant work and to determine whether plaintiff's impairments prevented performance of his past relevant work. An individual's past relevant work may be the job as he actually performed it or as it is generally performed in the economy. *Hernandez v. Massanari,* 2001 WL 1568767 *4 (N.D.Tex.) citing *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). A claimant, capable of performing past relevant work despite a severe impairment, has no disability. 20 C.F.R. § 404.1520(e).

The following issues are presented by plaintiff:

1. The ALJ erred when he determined plaintiff did not meet the Listed Impairment for depression under 20 C.F.R. Pt. 404, Subpt. P, App. 1, Sec. 12.04;

2. The case should be remanded due to significant gaps in the hearing transcript; and

3. The ALJ opinion was not supported by substantial evidence.

# IV.
# MERITS

## A.
## Listed Impairment

Plaintiff first argues the ALJ's decision that plaintiff's depression was not a listed impairment under 20 C.F.R. Pt. 404, Subpt. P, App. 1, Sec. 12.04 is error. The regulation states:

> 12.04 *Affective Disorders:* Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.[2]
>
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
>
>     1. Depressive syndrome characterized by at least four of the following:
>         a. Anhedonia or pervasive loss of interest in almost all activities; or
>         b. Appetite disturbance with change in weight; or
>         c. Sleep disturbance; or
>         d. Psychomotor agitation or retardation; or
>         e. Decreased energy; or
>         f. Feelings of guilt or worthlessness; or
>         g. Difficulty concentrating or thinking; or
>         h. Thoughts of suicide; or
>         i. Hallucinations, delusions, or paranoid thinking; or

.....

> AND
>     B. Resulting in at least two of the following:
>         1. Marked restriction of activities of daily living; or
>         2. Marked difficulties in maintaining social functioning; or
>         3. Marked difficulties in maintaining concentration, persistence, or pace; or
>         4. Repeated episodes of decompensation, each of extended duration;

Plaintiff argues he satisfies the requirements of this Listing because he meets A. 1. Depressive

---

[2] Plaintiff asserts he meets the Listing by satisfying the requirements of A and B, not C. Therefore the language of Subsection C has been omitted. Additionally, under Subsection A, plaintiff only alleges he satisfies the requirements of A(1) depressive syndrome, but not A(2) Manic Syndrome or A(3) Bipolar Syndrome, therefore those sections have been omitted as well.

Syndrome with (b) appetite disturbance with change in weight, (c) sleep disturbance, (e) decreased energy, (g) difficulty concentrating or thinking and (h) thoughts of suicide and meets all of the requirements of subpart B with (1) marked restriction of activities of daily living, (2) marked difficulties in maintaining social functioning and (3) marked difficulties in maintaining concentration, persistence, or pace. (Plaintiff's Brief at 7-8). As stated by defendant, all criteria must be met to qualify under the Listing. (Defendant's Brief at 3 citing *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990).

    In the instant case, the medical records show that on January 20, 2001 plaintiff was seen at Community Health Services by Dr. Biju Cherian and while there was a notation of "depression/anxiety problems" it does not appear plaintiff was being treated for these issues nor was he on any medication. (Tr. 114). On July 19, 2001 Dr. Dennis Plummer evaluated plaintiff and noted under the psychiatric category that plaintiff's affect, mood and vocalization were normal. The doctor cleared plaintiff for full time work. (Tr. 161-164).[3] On January 9, 2002 neurologist Dr. Michael Ryan noted that plaintiff was on Zoloft.[4] Dr. Ryan referred plaintiff to the Don & Sybil Harrington Cancer Center on January 14, 2002 for follow-up testing unrelated to depression or anxiety but the fact plaintiff was taking Zoloft was again noted in his medical records. (Tr. 155). On December 30, 2002 plaintiff was referred by the Texas Rehabilitation Commission to Dr. Raj Saralaya for evaluation. Although neither depression nor anxiety were listed by plaintiff as his chief complaints, plaintiff apparently informed the doctor he had a

---

[3] The Court understands this evaluation was made approximately five (5) months prior to plaintiff's alleged onset date but includes it so a clear picture of plaintiff's medical history may be evaluated.

[4] According to the website Zoloft.com such drug is prescribed for the treatment of depression and certain types of anxiety disorders.

history of depression and was taking Zoloft. (Tr. 167-169). The doctor, however, failed to note any depression or anxiety issues in his clinical impression. (Tr. 169). In a Review of Symptoms report completed by Dr. Saralaya on the same date, December 30, 2002, the box for "anxiety" under the heading "Psych/Social" was checked but the other boxes, "depression, mood changes, hallucinations, and phobias" were left blank. (Tr.171). Directions at the top of the report state, "If box is not checked [it] indicates negative symptoms. (*Id*.). Plaintiff was examined by Dr. Allan McCorkle on January 3, 2003 who noted,

> This gentleman with a history of two cerebral vascular accidents indicates that he has difficulties with memory and concentration. That he was been unable to work for about eight years since his most recent cerebral vascular accident. The patient states his concentration is poor. That he is sad and depressed at times although generally more recently he has been doing okay. He denies any excessive irritability. He denies any aggression, suicidality or homicidality. He denies any significant manic or panic symptomatology.
> .....
> The patient is currently on Zoloft, presumably at 50 mg. by his primary care physician. He indicates he has never seen a psychiatrist or mental healthcare provider in the past.

(Tr. 176). The doctor notes plaintiff's complaints of concentration deficits seem to manifest with plaintiff's abilities with Serial Sevens, that he was never hospitalized as a psychiatric inpatient, and that he has no previous suicide attempts. (Tr. 177). The doctor diagnosed plaintiff with Major Depressive Disorder, recurrent, severe without psychotic features. (Tr. 178). Finally in his prognosis the doctor opined, "The patient is doing relatively well at this time as far as his spirits go. He still has some cognitive dysfunction, I suspect that his depression is only partially treated." (*Id*.). On September 12, 2003, Dr. Plummer completed a Medical Release form in which he found plaintiff, "unable to work, or participate in activities to prepare for work, at all," found plaintiff's disability to be permanent, and noted such disability was due primarily to

plaintiff's transient ischemic attack with secondary disabling diagnosis of vertigo, pulmonary hypertension and chest pain." (Tr. 204). The doctor noted no limitations due to depression or anxiety. On April 6, 2004 plaintiff was seen at the Texas Panhandle Mental Health Mental Retardation center (TPMHMR) where he complained of sporadic sleep pattern, increased appetite and weight gain, high energy to low energy, vicious mood swings, trouble keeping his mood up with mood swings more frequent in the prior few months, frequent suicidal thoughts with a prior attempt at overdosing several years earlier. (Tr. 222). Plaintiff also reported he had taken Zoloft over a year ago and said, "I did well on Zoloft." (*Id.*). Plaintiff was scheduled for intake and assessment on April 8, 2004. At such appointment plaintiff complained of problems with memory, temper, depression, concentration, weight gain and sleeping, and stated he was fatigued, sad, unhappy and had thoughts of death. (Tr. 223). Plaintiff also made the statement, "My lawyer told me to come here." (*Id.*). The staff member noted plaintiff was spiritual and had successful response to prior treatment, he was neatly dressed, he was obese, he had a cooperative attitude, that his affect was restricted, that his mood was dysphoric (*i.e.* a state of feeling unwell or unhappy), that he had normal thought content but had obsessions and suicidal thoughts, that his thought process was logical and goal directed and that his motor activity was not remarkable. (Tr. 224). On April 16, 2004 a "Care Plan" was discussed and signed by plaintiff which included as his goals to reduce his irritability and increase normal social interactions with family and friends on a daily basis, to have an absence of suicidal thoughts for the next 90 days, and to increase ability to recognize and express angry feelings in an appropriate manner. (Tr. 220). It is not clear whether plaintiff was prescribed Zoloft at these visits. Nor does it appear plaintiff ever returned for follow-up treatment or received treatment from any other doctor for depression.

This is the extent of plaintiff's medical and treatment records related to depression and/or anxiety. As argued by defendant, much of the information contained in the record is subjective in nature. Moreover, the diagnoses of depression and/or anxiety are few and appear to be based primarily on plaintiff's subjective complaints. Further, plaintiff did not seek treatment from mental health professionals until April of 2004 and then stated such was being done upon instruction from his attorney.

Assuming, for purposes of argument, that plaintiff could meet four of the nine criteria in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Sec. 12.04 (A), there is evidence supporting a determination he failed to meet at least two of the four criteria required under subsection (B). The fourth criteria under subsection B requires repeated episodes of decompensation, each of extended duration. Plaintiff has not argued he satisfies this criteria, but instead he alleges he has marked restriction of activities of daily living and marked difficulties in maintaining concentration, persistence and pace.[5] In his opinion the ALJ stated, "In considering the 'B' criteria of 12.04 the undersigned finds there are moderate functional limitations in the area of concentration, persistence and pace and 'mild' limitations in the remaining areas of this listing. As a result of the foregoing, it is determined that Section 12.04 criteria are not satisfied." As previously discussed herein, the medical evidence simply does not support a finding of marked limitations in concentration, persistence and pace. In a residual functional capacity (RFC) assessment completed January 27, 2003 by Dr. Richard Alexander, it was determined plaintiff was "not significantly limited" in the main categories of Understanding and Memory, Sustained

---

[5] To the extent plaintiff also argues he suffers marked difficulties in maintaining social functioning such argument is without merit. In his reply brief plaintiff refers to the notations in Dr. McCorkle's records which state, "problems in social situations." (Tr. 178). The doctor's comment is not that plaintiff has <u>marked</u> limitations in this area. Other medical evidence exists to show plaintiff had no limitations in social interaction. (Tr. 185).

Concentration and Persistence, Social Interaction and Adaptation. (Tr. 184-186). In fact, this doctor found plaintiff only "moderately limited" in the subcategories of, "the ability to maintain attention and concentration for extended periods" and "the ability to respond appropriately to changes in the work setting." (Tr. 184-185).

Finally, although plaintiff alleges he suffers marked restriction of daily living activities the record fails to support this claim.[6] On December 30, 2002 plaintiff reported to Dr. Raj Saralaya, "He uses his computer at home all of the time. He cooks meals, cleans the house and mows the lawn. He carries out other household activities but complains of back pain when he does these activities." (Tr 167). On January 3, 2003 plaintiff reported to Dr. McCorkle, "He will help with keeping the home clean. He will feed the cats and busy himself with the computer." (Tr. 176). Although at the time of the hearing plaintiff testified he could no longer do these activities, he provided no medical evidence to substantiate his claims. A discussion about this very issue occurred at the hearing and the ALJ told both plaintiff and his attorney,

> But critical to the case [inaudible] is going to be the medical evidence that you give me subsequent to the hearing. Maybe you can prevail on the doctors that run these tests that they give us some kind of RFC, something you know [inaudible] complains of because you know, otherwise I'm pretty well stuck with what the medical evidence - - the records tell me. See if you can't get the doctor to give you some kind of, you know, something that - - I believe that Mr. Brunson indicated when you were asking him questions that he worsened subsequent to this interview by Dr. [inaudible] and he was no longer able to do those things. But as of that date, which I believe is December of 2002, if he was able to mow the grass and do all the housework and cooking and those things, it would be awful hard for me to find his (sic) disabled at that point. So let's see what you can get me, you know, if you would?

---

[6]Plaintiff argues the ALJ's determination that plaintiff did not have "marked" restrictions and/or difficulties as required by Subpart B is erroneous because the definition of "marked" is open to any one of several interpretations. If in fact "marked" is open to several definitions, then plaintiff has still failed to show the ALJ's definition was wrong or unreasonable. Instead, plaintiff has, at most, only shown the determination to be a discretionary finding which is clearly within the province of the ALJ. Further, as the defendant Secretary points out, the medical evidence supports the ALJ's finding of only mild to moderate restrictions rather than "marked" limitations.

(Tr. 258-259). It does not appear any medical records were submitted post-hearing and plaintiff has not directed the Court to any record created subsequent to January of 2003 which support plaintiff's claims. Plaintiff's first claim is without merit and should be denied.

B.
## The Hearing Record

Plaintiff next argues this case should be remanded because of significant gaps in the hearing transcript. Presumably plaintiff's argument is that the case must be remanded because the poor quality of the transcription of the administrative hearing prevents judicial review. Certainly, portions of the transcription are not ideal. The transcript, however, is not so inadequate as to prevent judicial review. As stated by defendant, remand is not required when ample evidence exists in the record from which a determination can be made. *Torres v. Shalala*, 48 F.3d 887 (5th Cir. 1995); *Brady v. Apfel*, 41 F.Supp.2d 659, 662 (E.D. Tex. Mar. 16, 1999). In this case, many of the "inaudible" portions of the transcript relate to background information which can be obtained from other portions of the record and/or the information can be understood from the context of the subsequent questions and answers. (Tr. 232-242; 245-248; 250-259). Once in the hearing plaintiff is asked whether he can usually use his hands and his response is "inaudible." (Tr. 244). When asked if he could dress himself, put on shoes and socks, shave and brush his teeth and hair, the responses were "inaudible." (Tr. 242-243). Even so, the ALJ was present and heard plaintiff's testimony and the ALJ later determined plaintiff could return to his past relevant work and there is nothing in the medical records to support an allegation that plaintiff cannot use his hands. The other portion of the record of concern occurs when plaintiff's attorney questions him as follows:

> Q: [Inaudible] Now, I don't know that it's reflected in the medical records, but in the

|       | personal history is it correct that you [Inaudible]. |
| ----- | --- |
| A:    | Yes. |
| Q:    | [Inaudible]? |
| A:    | Yes. |
| Q:    | [Inaudible]? |
| A:    | Yes. |
| Q:    | And [Inaudible]? |
| A:    | Yes. |
| Q:    | Both times? |
| A:    | Yes. |
| Q:    | And we don't have a record [Inaudible] Have you reported that to your doctors that were treating you, your neurologist? |
| A:    | Dr. Ryan [Inaudible]. |
| Atty: | Was there a lawsuit involved in [Inaudible]. |
| ALJ:  | - - do you know the dates of the accident, Mr. Betts? |
| Atty: | Judge, I do not. |
| ALJ:  | Anything else? |
| Atty: | Is there anything else, Kinney, that you want to tell the judge today?  Anything else that you'd like to tell the judge? |
| Clmt: | [Inaudible] Does he have a record of that? |
| Atty: | I gave him the most recent records I've got. |
| Clmt: | [Inaudible]. |
| Atty: | The last record I've got is April 13. |
| Clmt: | [Inaudible]. |

(Tr. 249-250).  The language "both times" combined with the reference to Dr. Ryan leads this Court to believe plaintiff's two transient ischemic attacks are being discussed and that plaintiff was possibly involved in an accident.[7]  However, even with this gap in the record, the Court is able to review and rule upon plaintiff's claims.  The Court is aware of plaintiff's two transient ischemic attacks and has reviewed those medical records.  Plaintiff has not alleged, and the medical records do not show, he was involved in some kind of accident, motor vehicle or otherwise, and that such accident is crucial to the determination in this case.  Plaintiff's claim that the record is inadequate for judicial review does not warrant reversal or remand.

---

[7]There is a reference in the record that plaintiff was involved in a motor vehicle accident as a young man.  (Tr. 155).

## C.
## Substantial Evidence

Lastly, plaintiff argues there was no substantial evidence to support the administrative finding of not disabled. As discussed above, the ALJ determined plaintiff suffered from an affective disorder, but found such impairment did not meet or medically equal a Listed Impairment. (Tr. 13). The medical records show plaintiff never sought psychiatric treatment until April of 2004, approximately one month before his administrative hearing. Further, plaintiff had been prescribed Zoloft by his primary care physician in the past and had done well on the medication. (Tr. 222). The ALJ found:

> Dr. A. McCorkle performed a consultative psychiatric evaluation on January 3, 2003. The claimant exhibited no excessive psychomotor agitation or retardation and was considered alert and maintained good eye contact. He also exhibited good thought processes by effectively interpreting proverbs. He did not exhibit auditory, visual or tactile hallucinations or delusions. Insight and judgment were also considered fair. His GAF score was assessed at 60.[8]
>
> The DDS medical consultant concluded the claimant is capable of performing detailed non-complex tasks, and that he could adapt to changes in a work setting that are consistent with past work as a hotel clerk.

(Tr. 15)(internal cites omitted). The findings of the ALJ are supported by Dr. McCorkle's findings and constitute sufficient evidence for the determination that plaintiff's affective disorder would not preclude him from engaging in his past relevant work as a hotel clerk. This Court cannot substitute its judgment for the ALJ's.

The ALJ also determined plaintiff suffered from a cerebrovascular impairment but that such impairment would not preclude past work. Plaintiff argues the ALJ failed to address

---

[8] GAF refers to the Global Assessment Functioning Scale which ranges from 1, persistent danger of severely hurting self or others, or unable to care for herself, to 100, superior functioning. The GAF scale goes from 0 to 100. A person with a GAF score above 60 indicates a person operating with no more than mild symptoms whose ability to work would not be significantly impaired.

plaintiff's spondylolisthesis, L5-S1, his advanced degenerative disc disease and a unilateral defect of the pars-interarticularis at L5. (Plaintiff's Brief at 3, citing Tr. 174). Plaintiff also alleges the ALJ failed to consider his visual impairment. (Plaintiff's Brief at 4). Review of the medical records show that on January 2, 2001, Dr. Debora Carrizo noted plaintiff had, " a cardiac cath about two years ago and that apparently showed clean arteries." (Tr. 115).[9] On January 15, 2001 Dr. Ryan noted plaintiff was not taking his prescribed medication but that, "His dizziness is getting better. I told him as long as it is resolving and getting better he can wait and watch." (Tr. 142). On January 20, 2001 plaintiff's pulmonary hypertension was described as "mild." (Tr. 113). On March 28, 2001 plaintiff had an electrocardiogram (ecg) which was "normal." (Tr. 111). On December 11, 2001 plaintiff was admitted to the hospital as a result of a transient ischemic attack. (Tr. 139). While hospitalized, plaintiff underwent several tests including a carotid doppler which was normal, (Tr. 120-121), a brain MRI which, "failed to demonstrate any evidence of active disease intracranially," (Tr. 122), a head MRI which, "failed to demonstrate any significant abnormality in the cervical region or intracranially," (Tr. 123) and a chest x-ray which showed, "normal views of the chest." (Tr. 134). On January 9, 2002 Dr. Ryan assessed plaintiff with, "spells of undetermined etiology" but noted, "They are getting somewhat less frequent and less severe." (Tr. 142).[10] When examined at the Don & Sybil Harrington Cancer Center on February 4, 2002 it was concluded plaintiff, "has no specific

---

[9] Medical records dated December 11, 2001 reflect the cardiac catheterization was performed in November of 1998 and was "normal." (Tr. 139).

[10] There was some mention of an abnormal test result for lupus anticoagulant but upon further testing plaintiff's lab work was normal. (Tr. 142, 144).

etiology to explain his transient ischemic attack." (Tr. 144).[11] An EKG performed December 30, 2002 revealed a, "suggestion of left atrial enlargement - rest normal." (Tr. 172). On January 31, 2003 Dr. M. Dolan completed a "Case Assessment Form" in which he stated, "48 yom [year old male] c/o [complains of] stroke, back pain, atypical cp [chest pain]. Exam is largely normal. Current ADL's [activities of daily living] include: cooking meals, cleaning house, mowing the lawn." (Tr. 201). As articulated by defendant, plaintiff alleged excruciating back pain but such complaint was not supported by medical evidence. Moreover, the ALJ determined plaintiff was not entirely credible in his complaints and his opinion is entitled to great deference. Plaintiff has failed to direct the Court to any medical evidence supporting these claims. Finally, it is not disputed that plaintiff has congenital blindness in his left eye. (Tr. 125). However, as noted by the ALJ, "The latter condition [vision impairment] is reportedly a congenital defect existing since birth. The record shows no problem associated with this impairment and it is apparent from the claimant's statements that he had been able to drive a motor vehicle until the recent TIA event." (Tr. 14). For the reasons stated above and based upon the medical evidence as a whole, substantial evidence exists to support the ALJ finding of not disabled.

V.
RECOMMENDATION

THEREFORE, for all of the reasons set forth above, it is the opinion and recommendation of the undersigned to the United States District Judge that the decision of the defendant Commissioner finding plaintiff not disabled and not entitled to a period of disability benefits be AFFIRMED.

---

[11] It was also noted that plaintiff's Mother, Grandmother and Great-grandmother all had strokes prior to the age of 50, presumably noting a genetic history.

# VI.
## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this 6th day of November 2007.

_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

### * NOTICE OF RIGHT TO OBJECT *

Any party may object to these proposed findings, conclusions and recommendation. In the event a party wishes to object, they are hereby NOTIFIED that the deadline for filing objections is eleven (11) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(B), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(D). When service is made by mail or electronic means, three (3) days are added after the prescribed period. Fed. R. Civ. P. 6(e). Therefore, any objections must be <u>filed</u> **on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b); R. 4(a)(1) of Miscellaneous Order No. 6, as authorized by Local Rule 3.1, Local Rules of the United States District Courts for the Northern District of Texas.

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).